[No. 574.    October 12, 1895.]

JOHN G. ALBRIGHT ET AL., APPELLEES, v. TEXAS SANTA FE & NORTHERN RAILROAD COMPANY ET AL., APPELLANTS.

CORPORATIONS—LIABILITY OF STOCKHOLDERS ON SUBSCRIPTIONS.—Where stock subscribed on the formation of a corporation, was sold upon an assessment made thereon, the creditors of the corporation were not precluded thereby from recovering on the failure of the stockholders to pay the ten per cent of their subscriptions, required by statute to be paid on incorporating; nor could such failure be set up by the stockholders in avoidance of the statute to escape liability.

ID.—PAYMENT OF SUBSCRIPTIONS IN CHECKS NOT TO BE PRESENTED—DATE OF OBLIGATION TO PAY.—Where the ten per cent of the subscriptions to the capital stock of a corporation, required by statute to be paid on the formation of the corporation, was paid in checks, which it was agreed should never be presented for payment, the obligation to pay dated from the day of the filing of the articles of incorporation in the office required by law to be filed.

ID.—RIGHT OF CREDITORS TO BE PAID OUT OF UNPAID SUBSCRIPTIONS—EVIDENCE.—The fact that the creditors of a corporation were told by officers of the corporation, before the indebtedness was incurred, that they would be paid out of the proceeds of certain bonds the corporation hoped to sell, was not sufficient to defeat their right to payment out of the unpaid subscriptions, where it was not claimed that the corporation, as such, had made any such agreement with the creditors, or that such officers had any authority to speak for the corporation, and the witnesses testified merely that they understood that the creditors "understood" that they were to look solely to the proceeds of the bonds for payment.

ID.—DISCOVERY OF FRAUD—LIMITATION.—Where it was stated in the articles of incorporation of a company that ten per cent of the subscriptions to its capital stock had been paid to the treasurer of the company, and the treasurer made affidavit that that amount had been actually paid him, the fact that, at the time an indebtedness was incurred by the corporation, the creditor was informed, by the treasurer, that such subscription had not been paid in, did not, under the statute, constitute a discovery so as to make the statute of limitations (Comp. Laws 1884, sec. 1865) begin to run.

ID.—PARTIES—ANSWER TO ORIGINAL BILL—SERVICE AND FAILURE TO ANSWER AMENDED BILL, EFFECT OF.—In such proceeding, where it appeared that one of the parties defendant answered the original bill, and was served with notice of the amended bill, but failed to answer the same, and complainant, instead of taking a decree pro confesso against him, treated him as having answered,—Held: That he was to be deemed as having denied the material allegations of the amended bill, and included in an affirmance of decree as to the other defendants.

APPEAL, from a decree for complainants, from the Second Judicial District Court, Bernalillo County. Affirmed; LAUGHLIN, J., dissenting.

The facts are stated in the opinion of the court.

E. A. FISKE for appellants.

W. B. CHILDERS for appellees.

COLLIER, J.—This is a bill in equity by John G. Albright and Alfred Grunsfeld, in behalf of themselves and other creditors who might come in and be made parties to the suit, against the Texas, Santa Fe & Northern Railroad Company, and also against Lehman Spiegelberg, Romulo Martinez, Antonio Ortiz y Salazar, Bernard Seligman, and Charles H. Gildersleeve, subscribers to the stock of said railroad company, as a corporation. It is alleged that the complainant Albright and one George H. Marshall respectively recovered judgments in the district court of Santa Fe county against said corporation, and that executions were issued, and returns of nulla bona were made on each, it

being alleged that the judgment recovered by Marshall had been assigned for value to the complainant Grunsfeld. The insolvency of the corporation is alleged, and that the other defendants were subscribers to its stock, as shown by the articles of incorporation, as follows, respectively: Spiegelberg, for two thousand shares; Seligman, two thousand shares; Martinez, one thousand shares; Ortiz y Salazar, five hundred shares; and Gildersleeve for five hundred shares,—each of the par value of $100 per share. It is also averred that neither of said defendants, who were charter subscribers, ever paid into the treasury of the corporation defendant any part of the par value of the stock so subscribed for, * * * and "that the failure to pay into the treasury of the said defendant corporation the par value of the said stock is in fraud of the rights of these complainants and other creditors of the said corporation defendant, and that the said funds consist and are the trust funds for the payment of the debts of the said corporation, and that the par value of each of said shares of stock is the sum of one hundred dollars." It is also alleged that the defendant Spiegelberg, as treasurer of the corporation defendant, received and had in his possession $80,000, part payment upon capital stock of said corporation, and that he has failed to account for same. The prayer of the bill is that defendants be decreed to pay the principal and interest on said judgments, and that they may "be decreed to apply for that purpose any money of property, real and personal, in law or equity, debts, choses in action, or equitable interests belonging to said defendant corporation, or in which it is in any way or manner beneficially interested," and for general relief. Demurrers were filed by all defendants, and overruled, and answers were filed by defendants Spiegelberg, Seligman, and Gildersleeve, and decree pro confesso was taken as to defendant corporation and defendants Ortiz y Salazar and Martinez. Upon

replication being filed to the answers that were filed, testimony was taken by special examiners, who reported same to the district court without any findings of law or fact. The proof being all reported to the court, the complainants obtained leave of the court "to amend the bill filed therein to correspond with the proofs taken, and that the defendants be required to answer the amended bill within twenty days from the service of a copy of the same, and that said cause be set down for trial as soon as the same is at issue on the amended pleadings." The amended answer was filed, which differed from the original bill in stating that Spiegelberg had failed to collect as said treasurer the ten per cent required to perfect the organization of said corporation; that the articles of incorporation alleged that ten per cent had been actually paid to said Spiegelberg as treasurer; that said articles were acknowledged and subscribed by said defendants, and that such treasurer had made affidavit that said ten per cent, amounting to $80,000, had been actually paid to him as treasurer for the benefit of the corporation; and that no such sum was in fact paid in, said subscribers delivering to Spiegelberg checks instead, in pretended payment, "it being then and there understood that the said checks should never be presented for payment." It is alleged that the defendants are liable for the entire value of the stock subscribed for, including said ten per cent. The prayer of the bill is that defendants may be decreed to apply for the purpose of paying said judgments said ten per cent, and for general relief. Defendants Spiegelberg and Seligman answered said amended bill, but the same was not answered by either of the other defendants.

The record is somewhat confused, but it is concluded that only the defendants Gildersleeve, Spiegelberg, and Seligman were served with notice of filing of amended bill, which was answered by the latter two and

not by Gildersleeve, as to whom, however, there was not taken any decree pro confesso. The answers of Spiegelberg and Seligman to the amended bill admit judgments obtained by Albright and Marshall, but deny there was such assignment to Grunsfeld as made him the real party in interest; deny insolvency of corporation defendant; deny that they lawfully subscribed for stock, and admit they paid nothing upon any subscription for stock; deny that said ten per cent is due, or that said ten per cent is a trust fund for the payment of debts. The answer sets up that Albright and Marshall, before said indebtedness was incurred, were advised that they must look for payment only upon a proposed sale of bonds of defendant corporation, and consented to look to the proceeds of such sale for payment, and not otherwise. It sets up the statute of limitations of six years, as follows: "That the said pretended cause of action and matters and things set up in said amended bill of complaint whereby the said complainants seek to charge this defendant, as stated in said bill of complainants, if in fact this defendant was in any manner chargeable with any such liabilities, matters, and things, which this defendant denies, accrued and existed above six years before," etc. A final decree was entered against the defendant company and the defendants Ortiz y Salazar and Martinez upon the decree pro confesso taken upon the original bill, and against the other defendants upon the proofs taken, it being recited in said final decree that Gildersleeve, as well as Spiegelberg and Seligman, had answered said amended bill, and that replications were filed, when in fact Gildersleeve had not answered same. The decree finds for complainants only as to the ten per cent in accordance with the prayer of the amended bill. So much for the record.

The testimony sustains the allegations of the bill and amended bill as to nonpayment of the ten per cent

payable at the time of organization of defendant com-
pany, and its insolvency, and the subscription for stock
by the other defendants.  There was also some testi-
mony, claimed by defendants to show that prior to the
incurring of indebtedness to complainants, and during
the years 1881 and 1882, they were informed that the
defendant company had no way of discharging the
same except out of a proposed sale of bonds of the
company, and that they were informed that the other
defendants had never paid the ten per cent required to
be paid in on organization, and that the checks of said
defendants had been put up in lieu of cash.  Extracts
from the testimony are as follows:  L. Spiegelberg
(cross-examination):  "Q.  Do you know whether or
not Mr. Albright and Mr. Marshall were aware of the
situation in reference to that $80,000 in checks?
A.  I am well aware of the fact that Mr. Albright
was.  Q.  At how early a time?  A.  It must have
been during 1881 or 1882.  Q.  Mr. Albright was very
well posted, was he not, as to all the steps taken in
the organization of that company?  A.  Most assur-
edly he was, because he came to me either in 1881 or
1882, and asked me concerning the business, or the
business he intended to do with T., S. F. & N. R. R.
Co.  I explained to him how matters stood in relation
to any claim he might contract or have in relation to
those checks.  Mr Albright knew and was well in-
formed that he nor anyone else could procure pay-
ment for any services rendered or to be rendered until
bonds or stock had been disposed of.  Q.  Do you
know whether or not he did the work for which he
afterwards obtained judgment upon the agreement
that he was not to receive his money until bonds and
stock of the company were sold and funds raised?  A.
Yes, sir; the only work he did."  On redirect examina-
tion this occurs:  "Q.  But you are positive that you
told him that you had those checks, and payment was

not to be enforced? A. I am positive of that; not only I, but other parties except me." This witness in a supplementary statement says: "What I mean to say is that the complainant Albright, before his debt for which he sues in this suit was incurred, knew that the ten per cent paid in on so-called 'charter subscriptions' was paid in only on checks, which both the maker and the company agreed should never be paid; and that he agreed to do his work for the company and look to a subsequent sale of bonds and stock for his compensation." There is also testimony by other witnesses to the effect that both Albright and Marshall were told as early as 1881 or 1882 that there was no money in the treasury, and they would have to rely for payment on a proposed sale of bonds; but there is no direct testimony that Marshall was ever informed that the ten per cent had not been paid in cash. Albright testifies that he can not say positively whether he was told or not that the charter subscribers had paid their ten per cent in checks, which it was understood was not to be paid up, but was to be returned.

Inasmuch as the amended bill of complaint seeks a recovery only upon failure of the charter subscribers to pay in ten per cent of their subscription, required by territorial law to be done by incorporators of defendant company, no part of a large mass of testimony pertinent under the original bill filed in the cause is included in the foregoing statement of facts. Also for this reason those portions of counsel's briefs, which refer to assessment and forfeiture of the stock standing in the names of defendants as charter subscribers are not touched upon further than to say that, if complainants are otherwise entitled to recover in this suit, they would not be precluded by reason of the fact that the stock defendants are alleged to have subscribed for, when becoming incorporators of defendant company, was sold upon an

LIABILITY of stockholders on subscriptions.

assessment made thereon, if in fact the ten per cent required to be paid in had previously become due, and still remained, when this suit was brought, unpaid. The fact of an assessment upon said stock, made as it was by the defendants themselves, might tend to show their status as stockholders, if this court entertained any doubt on that question. We do not, however, believe there can be any dispute that these defendants became, by the recitals in the articles of incorporation, subscribers to the capital stock of defendant company in the number of shares they respectively state they were, and we think the form in which they stated they were subscribers is made in as unimpeachable a manner as it could have been. It is provided by statute that the articles of incorporation shall show, among other things, "the amount of stock actually subscribed and by whom," and "that at least ten per cent of its subscribed capital stock has been paid to" the treasurer of the intended corporation. Laws, N. M., 1878, p. 17. It appears to be conceded however, by appellants' counsel, that the defendants would have been legal subscribers to the capital stock of defendant company if they had in fact paid in the ten per cent required by law, as was falsely stated in the articles of incorporation; but he contends that the failure so to do, which is conceded to have occurred, prevented them from becoming legal incorporators, or being in any way bound as subscribers, and to this contention he cites a number of authorities. Those furnished us we have examined, and we ascertain that none of them refers to subscriptions made subsequent to organization, and one of the cases says: "Under this provision it has several times been decided that no subscription to stock of a railroad corporation, made after the corporation was formed, was valid or binding until at least ten per cent of the amount had been paid." N. Y. & O. M. Railroad Co. v. Van Horn, 57 N. Y. 473.

In another the question arose in quo warranto proceeding by the people, where it was claimed the defendant was illegally exercising the franchises and privileges of a corporation, and it was held that such an evasion of the statute as was here resorted to could not avail. People v. Chambers, 42 Cal. 201. We think these cases are not in point, and that it does not lie in the mouth of these defendants to urge their illegal avoidance of the statute to escape liability, the corporation being recognized, and no proceedings being taken to call its organization in question by the proper authorities, even if that could be taken advantage of as against creditors. It is contended by counsel for appellants that the ten per cent required by law to be paid at and before the filing of the articles of incorporation became due from the subscribers at that time, and as to this

PAYMENT of subscriptions in checks never to be presented: date of obligation to pay.

we think there can be no doubt. It seems plain that the law, in requiring the ten per cent, considered it as derivable from the incorporators ratably in the amounts each subscribed for stock,. or from those not incorporators who subscribed for stock in the intended corporation, and that such should be a partial payment on subscription, the call for which the law itself made. We hold, therefore, that nonpayment in cash, but a pretended payment made in checks never intended to be presented for payment, made the obligation to pay date from the day the corporation became a legal entity, which was on December 10, 1880, the day the articles of incorporation were filed in the office required by law to be filed.

It is urged by appellants' counsel "that, as a general rule, unpaid subscriptions for stock are in equity a fund for the benefit of creditors; that to entitle the creditor to resort to this fund he must have

RIGHT of creditors to be paid out of unpaid subscriptions: evidence.

relied upon and given credit on account of the capital which the company was represented as having when the debt was

created." Appellants' Brief, p. 27. He also insists that these creditors knew at the time the debts for which judgments were obtained, and here sued on, were incurred, that these subscriptions were paid for in checks not intended to be cashed, and they agreed to wait for payment of their indebtedness until defendant company should sell certain stocks and bonds to pay the same. Looking at the testimony which appears in the record on this point, and somewhat extensively set forth, what does it import, taking the strongest phase appellants may contend for? Spiegelberg, Seligman, and Gildersleeve testify that Albright and Marshall were told by individual members of the corporation, who were also its officers, that they would be paid for the services they had rendered and were to render the corporation out of the proceeds of certain bonds the corporation hoped to sell, and they say these creditors understood that was their only reliance. It is not asserted that the corporation, as such, had any such agreement with these creditors, or that the informants of these creditors were authorized by the corporation to so state. What does that avail? It certainly can not be contended that such an understanding could have been set up in the actions upon which judgments were obtained, or that the defendant company could successfully enjoin the sale of any property of defendant company upon such statements being made by these individual informants, who at the time happened to be members of the board of directors of defendant company. If we admit that the authorities cited by appellants' counsel go to the extent contended for, we yet do not think that here is a state of case to which they are applicable. What these witnesses say they understood these creditors "understood" is a mere matter of opinion, and we do not think such evidence should weigh greatly in removing from the reach of creditors what so many decisions in

unbroken line have held to be a trust fund for the protection of creditors who deal with a corporation on the faith thereof, and especially when so to do would be to make effective the perpetration of a fraud so directly in the teeth of a most salutary statute.

The most difficult question in this case is that arising upon the plea of the six-years statute of limitations set forth in the above statement of facts. As there is no testimony in the record that Discovery of fraud: limita- tends to show that Marshall, the assignor tion. of Grunsfeld, had any knowledge of the transaction whereby these defendant subscribers, instead of paying in the ten per cent upon subscription required by the statute, put up bogus checks, this question will only be considered in reference to the complainant Albright. If the testimony shows that there was such a discovery by Albright of the fraud practiced in the organization of defendant as made the statute of limitations begin to run, it would then be our duty to further consider whether the statute was well pleaded in equity, where the facts constituting the bar ought to be set up. If it does not show, we need go no further. In this case there was no reference to a master to report the testimony and his findings of law and fact thereon, but it was merely to a special examiner, directed to reduce the testimony taken before him to writing, and report the same to the court, without any findings of law or fact. This record is, therefore, before us just as it was before the district court,— a dry transcript, from which conclusions both of law and fact are to be drawn. In such case the whole matter is before this court as one of new impression, and if we differ with the conclusions of the district court on questions of fact, we are as much bound to express our dissent as if the difference were one of law. The value of a master's report rests upon the well-recognized theory announced by this court at this term

in the case of Marshall Field & Co. v. M. Romero & Co., that the master sees the witnesses, and hears them testify, and is far more capable of deciding questions of fact than any court by the mere perusal of a dry, dead transcript. Looking, then, at this transcript, what do we find? It shows the solemn statutory statement made by these defendants that they were subscribers to the capital stock of defendant company, and that ten per cent of such subscribed stock has been paid to the treasurer of said company, namely, Lehman Spiegelberg; and, in addition, it shows the affidavit required by law of said Spiegelberg, treasurer, that said ten per cent is "actually paid." No other witness than Spiegelberg pretends to testify that he knows that Albright was ever told about this payment by check transaction, but Seligman and Gildersleeve only testify that it was understood that Albright and Marshall "understood" that they must look to the sale of certain bonds to get their pay,—a matter we have already adverted to. Albright says that he has no recollection that he was ever informed about the check transaction. Concede, however, that Spiegelberg told him about it, does that, under our statute, constitute a discovery so as to make the statute of limitations begin to run? Our statute reads as follows: "In actions for relief on the ground of fraud or mistake * * * the cause of action shall not be deemed to have accrued until the fraud * * * complained of shall have been discovered by the party aggrieved." Comp. Laws, N. M., sec. 1865. Shall such a statement, made in an informal way by Spiegelberg, which not only controverts his affidavit, but also imputes fraud to all the incorporators of defendant company, be decreed a discovery fixing a period for the statute to begin to run against a creditor's right to subject a trust fund to his debt? It is our view that such slight circumstances should not serve to deprive creditors of a corporation

of their vested rights, and that such information, if given even more explicitly than is here shown, would not constitute discovery of fraud, or such notice as would create laches amounting to discovery.

As to the defendants Antonio Ortiz y Salazar and Romulo Martinez, we hold that the relief prayed in the amended bill comes within that prayed for in the original bill, and that it was not substantial error to fail to give them notice of the filing of the amended bill, and that final decree was rightly entered against them.

As to the defendant Gildersleeve, it appears that he answered the original bill, and was served with notice of the amended bill, but failed to answer the same. We think that, if complainants failed to take a decree pro confesso against him, but treated him as having answered, he should be deemed as denying the material allegations of the amended bill, and, as we have held these allegations were established by the proof, and as he can not complain of being treated with more consideration than he was entitled to, the decree of the lower court should also be affirmed as to him. Other questions in the record we do not understand to be seriously insisted on. Wherefore it is our opinion that, there being no error apparent of record in this cause, the decree should be affirmed, and it is accordingly so ordered, and this cause remanded, with directions to carry the decree into effect.

HAMILTON, J., concurs. LAUGHLIN, J., dissents.